IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIFFANY NICHOLE JONES, | ) | Case No. 1:23-cv-261 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Tiffany Nichole Jones, seeks judicial review of the final decision of the
Commissioner of Social Security, denying her application for supplemental security income
("SSI") under title XVI of the Social Security Act.  This matter is before me pursuant to 42
U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge
("ALJ") applied proper legal standards and reached a decision supported by substantial evidence,
I recommend that the Commissioner's final decision denying Jones's application for SSI be
affirmed.

## II.    Procedural History

On April 1, 2021, Jones filed an application for SSI.  (Tr. 10, 63, 78).  Jones alleged a
disability onset date of March 31, 2020, (Tr. 10, 62, 77, 179), and asserted that she was disabled
due to cervical root nerve disorder, cervical stenosis, degenerative disk disease, osteoarthritis of
spine with radiculopathy, and fibromyalgia, (Tr. 63, 78, 217).  The Social Security

Administration denied Jones's applications at the initial level. (Tr. 63-76). At the reconsideration level, Jones asserted for the first time that mental health issues were also preventing her from engaging in full time work, (Tr. 78, 234), and the Social Security Administration again denied her application, (Tr. 78-89). Jones requested a hearing. (Tr. 112-131). On August 17, 2022, ALJ William Leland issued an unfavorable decision, finding that Jones had not been under a disability within the meaning of the Social Security Act from April 1, 2021 through the date of the decision. (Tr. 7-28). On December 20, 2022, the Appeals Council denied Jones's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). On February 9, 2023, Jones filed a complaint to obtain judicial review. ECF Doc. 1.

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Jones was born on September 6, 1980 and was 40 years and 6 months old on the alleged onset date. (Tr. 63, 186, 282). Jones did not graduate from high school but obtained a GED. (Tr. 16, 218, 563). Jones's past work included: "nurse assistant," "data entry," "general labor," and "receptionist." (Tr. 75, 206-210).

### B. Relevant Medical Evidence

On July 2, 2020, Jones visited Antwon Morton, DO, complaining of neck pain that began in December 2019. (Tr. 455). Jones's review of systems and general examination were unremarkable. (Tr. 456, 459-459). Dr. Morton diagnosed Jones with cervical spondylosis (age-related wear and tear on spinal disks), finding she had congenital narrowing and ossification of posterior longitudinal ligament causing moderate narrowing of the spinal canal. (Tr. 456, 459).

On August 6, 2020, Jones had a follow up appointment with Dr. Morton at which she complained of acute pain in her neck, left shoulder, and left arm, and reported radiating pain, numbness, tingling, and burning symptoms.  (Tr. 449).  Jones's review of systems and physical examination were unremarkable.  (Tr. 450, 453).  Her neurological exam revealed normal sensation, reflexes, strength, and fine motor coordination in her upper extremities.  (Tr. 453).

On March 25, 2021, Jones went to the MetroHealth Emergency Department because of her chronic and worsening neck pain.  (Tr. 413).  Jones's review of symptoms and her mental and physical examinations were largely unremarkable – save for positive symptoms for pain and frequent and urgent urination.  (Tr. 413-416).  On April 2, 2021, Jones went to the Brecksville Health and Surgery Center for an evaluation of her severe neck pain, with Jones complaining of occasional arm and hand pain, stiffness of her hands in the morning, and having to use a cane to walk.  (Tr. 407-408).  Jones also reported feeling anxious and depressed.  (Tr. 407).

On April 19, 2021, Jones visited the Cleveland Clinic Main Campus for her primary complaints of lower back, neck, and arm pain.  (Tr. 319).  She also complained of: (i) a tingling and "weird sensation" in her left 4th and 5th fingers; (ii) loss of balance and coordination; (iii) dropping things with her left hand in recent months; (iv) needing a cane to walk; and (v) exhaustion, recent weight loss, and "brain fog."  (Tr. 319).  Julianna Godfray, PA, examined Jones and noted upon examination that Jones presented mild left arm weakness and no myelopathic signs.  (Tr. 324).  Jones was primarily diagnosed with cervical radiculitis (compression or irritation of a nerve in the neck), as well as low and mid back pain and spinal stenosis of the cervical region.  (Tr. 324).

The same day, Jean Schils, M.D., interpreted X-rays of Jones's cervical spine and lumbar spine.  (Tr. 353-359).  The X-ray of the cervical spine showed straightening of the normal

3

lordosis with kyphotic deformity at the C3-C4 level, no spondylolisthesis, vertebral bodies of normal height, no vertebral fracture, disc space narrowing involving C4-C5 and C5-C6 with osteophyte of the endplates and degenerative changes of the uncovertebral joints, degenerative changes of the facet joint at C4-C5 and C5-C6 on the left side, and normal soft tissues. (Tr. 356-359, 635).  The X-ray of the lumbar spine showed normal alignment, no scoliosis or kyphosis, no pars defect or vertebral fracture, normal disc spaces, normal facet joints maintained, normal soft tissues, unremarkable SI joints, and maintained bilateral hips.  (Tr. 353-356, 633-634).

On May 3, 2021, MRIs were taken of Jones's cervical, thoracic, and lumbar spine, which showed: (i) normal alignment; (ii) normal soft tissues; (iii) mild to moderate spinal canal stenosis, most pronounced at C4-C5; (iv) no high grade foraminal stenosis; and (v) otherwise normal appearance of the thoracic and lumbar spine.  (Tr. 330-353; 623-625, 627-630).

On May 19, 2021, Jones had a follow up visit with Ms. Godfray, in which Jones complained of the same low back, neck, and arm pain – which she stated began in January 2020 and she described as located along the spine from her neck to tailbone and radiating down her left arm.  (Tr. 305-306).  Jones stated that the pain was currently at a 9/10 level, she still needed a cane to walk, her balance and coordination were poor and not improving, and her entire left side was weaker than her right.  (Tr. 306).  She also complained of morning stiffness that affected her hips, back, and hands.  (Tr. 306).

On May 27, 2021, Jones had an appointment with Dr. Morton for her chronic neck, left shoulder, and arm pain.  (Tr. 381).  Jones reported sleep and mood disturbances.  (Tr. 381).  Dr. Morton concurred with his previous finding that Jones had cervical spondylosis with "[m]ultilevel degenerative changes, congenital narrowing and ossification of posterior

longitudinal ligament causing moderate narrowing of the canal." (Tr. 382, 385). Jones's review of symptoms was unremarkable. (Tr. 382). Her physical examination revealed that she was alert and oriented and otherwise normal. (Tr. 385). Her neurological examination revealed that Jones had normal motor strength, fine motor coordination, and gait. (Tr. 385).

On June 9, 2021, Jones saw Sarah Samer, M.D., at the Cleveland Clinic Center for General Neurology. (Tr. 289-305). Jones complained of continuing pain in her hips, neck, and shoulder area, numbness and tingling in her finger and in the left leg and buttocks, chronic fatigue and brain fog, and joint pain in the morning. (Tr. 299). Jones's general examination revealed that: (i) mentally, she was "[a]lert, fully oriented, attentive, with normal cognition, memory, speech and affect"; (ii) for motor examination and coordination, she had normal bulk, strength, tone, and coordination, with no "adventitious movement or significant tremor"; and (iii) her reaction to sensation and her gait were normal. (Tr. 299-300). Dr. Samer stated that she strongly suspected Jones had a chronic pain syndrome such as fibromyalgia based on Jones's symptoms and neurological examinations and MRIs revealing no evidence of underlying neurological disease. (Tr. 300).

On June 14, 2021, Jones had a consult for fibromyalgia with Patompong Ungprasert, M.D. (Tr. 293-298). Jones's physical examination revealed "[p]ositive fibromyalgia tender spots in elbows, neck, occiput, shoulder blade, anterior chest wall, knees, lower back and greater trochanters[,]" but was otherwise unremarkable. (Tr. 293-296). Dr. Ungprasert found that testing and examination revealed no systemic rheumatologic autoimmune disease, inflammatory arthritis, or elevated inflammatory markers. (Tr. 297). Dr. Ungprasert stated that he believed Jones's chronic diffuse pain was caused by fibromyalgia and spondylosis and started treatment with medication. (Tr. 297).

On July 13, 2021, Jones had a phone consultation with Dr. Morton concerning her chronic pain, where Jones reported 80% pain relief, sleep improvement, minimal and intermittent symptoms, and improved functional limitations.  (Tr. 513, 517).

On July 19, 2021, Jones had a follow up appointment with Dr. Ungprasert where she reported that her: (i) back and neck pain were significantly better after cortisone injections, with pain down 90%; and (ii) diffuse pain was better after treatment with gabapentin.  (Tr. 525-526).  Dr. Ungprasert remarked that Jones was doing significantly better and he would continue her gabapentin treatment.  (Tr. 526).

On August 1, 2021, Jones visited the MetroHealth West Park Health Center where she complained of worsening hip pain.  (Tr. 547).  Leah Belcastro, APRN-CNP, noted that Jones had been diagnosed with fibromyalgia and had received an injection for cervical stenosis, which appeared to help her neck but not her hips.  (Tr. 547).  After performing an X-ray and examination, Nurse Belcastro found that there were no abnormalities to explain Jones's bilateral hip pain.  (Tr. 548).

On August 16, 2021, Jones visited the MetroHealth Emergency Department for continuing bilateral hip pain.  (Tr. 540).  Jones's review of systems and physical examination were unremarkable – with Jones: (i) displaying full range of motion at bilateral hips, knees, and ankles; (ii) possessing normal strength and sensation; and (iii) neurologically, being alert, oriented, awake, and responding appropriately.  (Tr. 540, 542).  Jonathan Frommelt, M.D., evaluated Jones and remarked that she was able to ambulate without difficulty and without the use of assistive devices.  (Tr. 542).

On September 28, 2021, Jones had a telephone visit with Dr. Morton where she requested guidance on how to approach issues related to posttraumatic stress order ("PTSD") and whether

she should follow a state doctor's recommendation to seek help from a mental health professional.  (Tr. 574-577).  Dr. Morton recommended that she follow-up with a psychiatrist or psychologist.  (Tr. 577).

On October 8, 2021, Jones had an X-ray taken for her right and left foot, with the X-rays showing no osseous abnormality in either foot and a bilateral hallux valgus deformity with bunion, left more prominent than right.  (Tr. 592-595).

On October 13, 2021, Jones visited King Ogbogu, M.D., for a nerve conduction study and electromyography of her bilateral upper extremities.  (Tr. 591).  The EMG showed subtle abnormalities suggestive of a mild chronic left C8-T1 radiculopathy and no evidence of focal entrapment neuropathy in either limb.  (Tr. 591).

On October 19, 2021, Jones called Dr. Morton to review her EMG results and complained of neck pain, radiating pain and numbness in her bilateral upper extremities. (Tr. 606-610).  Her review of systems showed that she had neck pain and numbness in her bilateral upper extremities, as well as sleep disturbance, anxiety, and feelings of depression. (Tr. 607).  On October 21, 2021, Jones visited Andy Orta, DPM, about her bilateral bunion pain and they discussed both conservative and surgical treatment options.  (Tr. 603-606).

During an appointment on November 1, 2022, Dr. Ungprasert remarked that Jones was continuing to do well from a fibromyalgia standpoint, with her diffuse muscle and joint pain becoming mild while using gabapentin and drowsiness to the medication lessening with an adjustment of the dosage.  (Tr. 766).  Neurological examination showed motor power to be 4/5 in her right arm, with Dr. Ungprasert noting he was unsure if it was due to true weakness or extreme pain, and 5/5 in all other extremities.  (Tr. 768).  Jones showed tenderness over the

cervical spine but no tenderness or swelling over joints in the bilateral shoulders, elbows, wrists, fingers, hips, knees, and ankles, all with full range of motion. (Tr. 768-769).

On February 8, 2022, Jones had an in-office visit with Dr. Ungprasert where he noted that her diffuse pain was stable but her back and neck pain had become significantly worse over the past three months. (Tr. 730-731). Jones's physical examination revealed positive soft tissue tender points but was otherwise unremarkable with neurological functioning being grossly intact with 5/5 motor power. (Tr. 733). An MRI of the cervical, lumbar, and thoracic spine demonstrated normal alignment, mild to moderate spinal canal stenosis at C4-C5, no significant thoracic canal or foraminal stenosis, and no lumbar spondylosis. (Tr. 733-735). Dr. Ungprasert stated that Jones's fibromyalgia was more or less stable on gabapentin and her back pain was not inflammatory in nature, which would make ankylosing spondylitis unlikely. (Tr 735-736).

On April 7, 2022, Jones visited Dr. Morton and reported that her last fluoro guided CESI provided no relief for her pain and numbness symptoms and she was getting minimal relief from gabapentin and Flexeril. (Tr. 672). Her review of systems showed that she had neck pain and numbness in her bilateral upper extremities, as well as sleep disturbance, anxiety, and feelings of depression. (Tr. 672). Dr. Morton directed Jones to continue with her pain medications as directed. (Tr. 677).

On May 3, 2022, Jones visited Brendan Astley, M.D., for her chronic neck pain and myelopathy, with Jones reporting that her neck and body pain had had a gradually worsening course which was made worse through overuse. (Tr. 685-686). She also reported that the pain was currently sharp, intense, continuous, chronic and without radiation to legs, or buttocks, with some radiation to the hands and numbness in the 4th and 5th digits. (Tr. 686). An MRI was completed which demonstrated unchanged reversal of normal cervical lordosis with accelerated

degenerative changes and moderate spinal canal stenosis at C4-5 and multilevel ventral cord abutment/indentation without cord signal abnormality. (Tr. 685-686). Jones's review of systems was unremarkable with Jones presenting as alert, cooperative, and in no distress with lungs clear to auscultation, regular heart rate and rhythm, and tenderness to palpation over paraspinal muscles. (Tr. 690). Jones presented no neurological symptoms, including no weakness, numbness, tremors, memory loss, or gait problems. (Tr. 690).

On May 5, 2022, Jones received a lidocaine infusion as treatment for her fibromyalgia. (Tr. 695-696). At a follow up appointment on May 10, 2022, Jones noted that the lidocaine injections had provided her with great relief, and she remarked that she was "loving it." (Tr. 704-705). Her review of symptoms showed that she had no neurological issues, including no gait instability or hand dexterity issues. (Tr. 705). Jones's physical examination demonstrated that she was in no distress and had 5/5 strength in bilateral upper and lower extremities, no myelopathic reflexes, no sensory deficits to light touch, 2+ and equal deep tendon reflexes, and normal gait. (Tr. 707).

### C. Relevant Opinion Evidence

#### 1. State Agency Medical Consultants

On initial review, state agency reviewing medical consultant Mehr Siddiqui, M.D., completed an assessment of Jones's physical residual functional capacity ("PRFC"). (Tr. 70-72). Dr. Siddiqui opined that Jones could: (i) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (ii) stand and/or walk four hours and sit about six hours in an eight-hour workday; (iii) frequently climb ramps or stairs (but never climb ladders, ropes, or scaffolds); (iv) frequently stoop, kneel, crouch, and crawl; and (v) frequently reach overhead bilaterally but otherwise had no other manipulative limitations. (Tr. 70-71). As for environmental limitations,

Dr. Siddiqui found that Jones must avoid all exposure to hazards, including no unprotected heights and dangerous machinery.  (Tr. 71).  At the reconsideration level, Leon Hughes, M.D., reviewed and affirmed Dr. Siddiqui's findings as to Jones's PRFC.  (Tr. 83-85).

### 2.    State Agency Psychological Consultants

On initial review, state agency reviewing psychological consultant Sallie Boulous-Sophy, Ph.D. completed a Psychiatric Review Technique ("PRT"), (Tr. 67-68), and an assessment of Jones's Mental Residual Functional Capacity ("MRFC"), (Tr. 72-74).  Dr. Boulous-Sophy opined that Jones had certain moderate limitations in her ability to: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself.  (Tr. 67, 73-74).  For the MRFC, Dr. Boulous-Sophy found that:

> [Jones] is able to understand, carry out, remember, and perform simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work) but would complete all end of day goals; involving only simple, work-related decisions with the ability to adapt only to routine work place changes.  [Jones] is occasionally able to interact with supervisors and co-workers and should have superficial non-transactional contact with the general public.

(Tr. 74).  At the reconsideration level, David Dietz, Ph.D., reviewed and affirmed Dr. Boulous-Sophy's findings as to the PRT and Jones's MRFC.  (Tr. 80-81, 85-87).

### 3.    Stephen Billmann, Psy.D.

On September 23, 2021, Stephen Billmann, Psy.D., conducted a clinical interview of Jones and produced a psychological evaluation opinion.  (Tr. 562-567).  Dr. Billmann made the following observations concerning Jones's mental status within specific areas:

> ***Flow of Conversation and Thought*** The claimant's speech was clear and 100% understandable. It was of reduced rate and tone.  She was adequately organized and easily followed conversationally. Her thoughts were logical, coherent, and goal directed.  Her phraseology, grammatical structure, and vocabulary suggest that she is of average intelligence.

***Mood and Affect*** The claimant's mood appeared depressed.  She demonstrated a constricted affect with mild irritability and was tearful.  She denied ever experiencing suicidal or homicidal ideation.

\* \* \*

***Sensorium and Cognitive Functioning*** The claimant was alert, responsive, and oriented to person, place, time, and situation. . . . Her overall intellectual abilities appear to fall in the average range.  She demonstrated significant short-term memory recall deficit without category cues.

***Insight and Judgment*** The claimant's judgment appears sufficient for her to make decisions affecting her future and to conduct her own living arrangements. She demonstrated insight into her current difficulties.  She appears capable of accessing community supports as needed.

(Tr. 565).  Dr. Billmann stated that Jones's history, symptoms, and presentation were consistent with PTSD, major depressive disorder (moderate, single episode), and opioid use disorder (severe, in sustained remission).  (Tr. 566).

Dr. Billmann opined the following concerning Jones's functional limitations.  Jones had average intelligence, but her short-term memory difficulty made it unclear whether she could manage her own funds adequately.  (Tr. 566).  Because of short-term memory deficits, she was expected to have some limitations in the area of understanding, remembering, and carrying out instructions.  (Tr. 567).  She may experience significant limitations in the area of maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.  (Tr. 567).  Because of her PTSD, even though she did not report difficulties with coworkers and supervisors, she was likely to have difficulty working around others until treated and some limitations were expected in the area of responding appropriately to supervisors and coworkers in a work setting.  (Tr. 567).  Significant limitations were expected in the area of responding appropriately to work pressures in a work setting due to her physical and PTSD symptoms. (Tr. 567).

### 4.      Physical Residual Functional Capacity Assessment

The record includes a Physical Residual Functional Capacity Assessment form for Jones that was dated on August 1, 2022, but the form includes an illegible signature and no other indication as to who filled out the form.  (Tr. 784-791).  The form indicated a primary diagnosis of cervical radiculopathy and secondary diagnosis of lumbar degenerative disc/joint disease.  (Tr. 784).  For external limitations, the form had checked boxes indicating Jones: (i) could occasionally and frequently lift and/or carry 10 pounds; (ii) required a medically hand-held assistive device for ambulation; (iii) must periodically alternate sitting and standing to relieve pain or discomfort; and (iv) had limited push and/or pull in upper and lower extremities.  (Tr. 785).  For postural and manipulative limitations, the form indicated that Jones: (i) occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl; and (ii) had limited abilities for reaching, handling, fingering, and feeling due to cervical stenosis causing upper extremity numbness/weakness.  (Tr. 786-787).

### D.      Relevant Testimonial Evidence

Before the ALJ hearing, Jones submitted a brief which argued that she could not perform light or even sedentary work because she: (i) was unable to sit, stand, or walk for any extended period of time; (ii) lacked the ability to "perform repetitive fine motor, gross motor, or dexterity tasks with the bilateral upper extremities"; (iii) could not maintain a static neck or seated position and required frequent position changes and rest breaks; (iv) suffered "from distracting pain, fatigue, and medication side effects and she would be off task at least fifteen percent of the time during a normal, 8-hour workday."  (Tr. 282-283).

At the hearing before the ALJ, Jones testified that she was unable to work because of radiating pain in her hands, lumbar spine, and hips, weakness in her legs, bladder issues, and

numbness and tingling in her toes and hands.  (Tr. 46).  She further testified that her neck, hands, arms, legs, and hips were in constant pain throughout the day and described the pain as 7 or 8/10 with medication and 10/10 without medication.  (Tr. 46-47).  She testified that she was able to: (i) sit comfortably for 30 minutes before having to lie down; (ii) stand for 20 minutes with a cane and about 10 minutes without a cane; (iii) walk less than 200 feet with a cane and walk only 2 minutes without a cane; (iv) lift 5 to 8 pounds.  (Tr. 47-48).  She testified to having to use a cane every day.  (Tr. 47-48).

Jones stated that she sometimes had difficulty remembering to perform self-care (e.g., remembering to brush her teeth, bathe, and take medication) and her adult children would visit her two to three times a week.  (Tr. 48).  She testified that she spent her free time watching television and lying down, with some issues maintaining focus.  (Tr. 49).  Regarding household chores, Jones stated that she performed household chores in 15-to-20-minute increments, and she occasionally washed the dishes and put clothes in the washing machine and dryer but added that her adult children helped with the balance of washing dishes and laundry, and did most of the cooking, dusting, vacuuming, sweeping, and mopping.  (Tr. 49-50).  She testified that her medications had negative side effects which included sleepiness, fatigue, dry mouth, mood changes, drowsiness, and headaches, and her condition had grown worse over the last few years. (Tr. 50-51).  In response to questioning from her own attorney, Jones testified that she had low energy, poor appetite, and mood issues that included feelings of anger and depression.  (Tr. 53).

## IV.    The ALJ's Decision

On August 17, 2022, the ALJ issued an unfavorable decision.  (Tr. 10-29).  At Step Two, the ALJ determined that Jones had the following severe impairments:

> fibromyalgia; reversal of normal cervical lordosis with accelerated degenerative changes and moderate spinal canal stenosis at C4-5 and multilevel ventral cord

13

abutment/indentation without cord signal abnormality and mild C8-Y1 nerve involvement; lumbar spondylosis/facet arthropathy; bilateral hallux valgus deformity with bunion, left more prominent than right; depression; and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

(Tr. 13).

At Step Four, the ALJ determined that Jones had the residual functional capacity ("RFC") to perform work at a sedentary exertional level, except that she was further limited in the following respects:

> [Jones can] occasionally reach overhead with the right and left; frequently reach in all other directions with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.  [Jones] requires a cane to ambulate.  [Jones] has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks but not at a production rate pace (i.e., assembly-line work); is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; is able to occasionally interact with supervisors and coworkers and never interact with the public.

(Tr. 17-26).

### A.    Analysis of Jones's Subjective Symptom Complaints and Medical Evidence

In coming to this determination, the ALJ reviewed Jones's statements concerning the intensity, persistence, and limiting effects of the symptoms from her physical and mental impairments, and he determined that they were inconsistent with the medical evidence and other evidence in the record.  (Tr. 18-19).  The ALJ also considered Jones's "daily activities; the nature of the symptoms; precipitating and aggravating factors; the medications and any side effects; and other treatment followed and measures used to relieve the symptoms" when he assessed Jones's symptom complaints and found that the RFC "adequately addresses the location, duration, frequency, and intensity of [Jones's] alleged symptoms as well as precipitating and aggravating factors."  (Tr. 19-20).

14

In relevant part, the ALJ considered the following medical evidence in relation to Jones's complaints concerning her fibromyalgia and weakened manual dexterity:

> The claimant reported chronic low back, neck and arm pain and diffuse pain spreading throughout her body. She described severe neck pain constant and worse with certain movements and often radiating down to her arms bilaterally. She also described morning stiffness affecting her hands, hips, and back, neck pain radiating to the shoulder blades and top of the shoulders to the left posterior upper arm to ulnar forearm and tingling in the left 4th and 5th fingers ([Tr. 299, 306, 407, 509]). She drops things with the left hand, has numbness and tingling in the legs after sitting an extended time, poor balance and coordination, weakness in muscles, and fatigue. She also described left knee pain going downstairs, left knee almost giving out, and using two braces for the upper and lower back and a cane to ambulate and for support. She endorsed soft tissue tenderness almost everywhere, cannot sleep well due to pain, and symptoms affecting activities of daily living.

> * * *

> Regarding fibromyalgia, the claimant was noted to not have any systemic rheumatologic autoimmune disease, but findings were positive for widespread tender spots throughout the body consistent with a diagnosis of fibromyalgia ([Tr. 765]).

> * * *

> For example, examination was positive for fibromyalgia tender points in elbows, neck, occiput, shoulder blade, anterior chest wall, knees, lower back, and greater trochanters but maintained full range of motion and no tenderness or swelling in bilateral shoulders, elbows, wrists, fingers, hips, knees, and ankles (Tr. 293, 295-296]). She noted to use a cane, although other examinations, example in April 2021 and August 2021 indicated normal gait, including tandem, able to ambulate without the use of an assistive device, and could stand on one foot at a time ([Tr. 407, 542]). She showed some positive signs for pain with active and passive range of motion of the hips and tenderness over the bilateral femoral head with palpation and instances of using a cane to ambulate ([Tr. 540, 547]). Motor power noted to be 4/5 in the right arm, although could not be determined whether it was due to true weakness or extreme pain, otherwise 5/5 throughout extremities, and full range of motion ([Tr. 767-769]). The claimant showed tenderness over the cervical spine but no tenderness or swelling over joints in the bilateral shoulders, elbows, wrists, fingers, hips, knees, and ankles. Examinations also indicated the claimant was doing significantly better and continued to do well from a fibromyalgia standpoint with only mild diffuse muscle and joint pain with gabapentin and drowsiness noted to be minimal after adjusting the dosage ([Tr. 526, 731, 766]). The claimant reported 80 to 90 percent relief from cortisone injections ([Tr. 517, 525]).

In addition, neurological evaluations indicated the claimant was alert, fully oriented, attentive with normal cognition, memory, speech, and affect, intact cranial nerves throughout, normal bulk, strength, and tone, no drift, normal rapid alternating movements and coordination, normal fine motor coordination, no tremor, 2+ and equal deep tendon reflexes, intact sensation to light touch, and normal, casual cautious gait ([Tr. 299-300, 385, 512-513, 542]).  Mental status indicated pleasant, alert, and oriented with appropriate mood and affect ([Tr. 512]).

* * *

Fibromyalgia was noted to be generally stable on gabapentin.

* * *

During an office visit on May 3, 2022, the claimant reported neck pain and body pain with radiation to the hand and numbness in the 4th and 5th digits and symptoms worsened by overuse ([Tr. 686-693).  Updated imaging reflected unchanged reversal of normal cervical lordosis with accelerated degenerative changes and moderate spinal canal stenosis at C4-5 and multilevel ventral cord abutment/indentation without cord signal abnormality ([Tr. 686]). On examination, the claimant presented as alert, cooperative, and in no distress with lungs clear to auscultation, regular heart rate and rhythm, tenderness to palpation over paraspinal muscles, but no neurological symptoms, such as weakness or gait problems ([Tr. 690]). . . .  On examination, the claimant was in no distress and showed no peripheral edema, 5/5 strength in bilateral upper and lower extremities, no myelopathic reflexes, no sensory deficits to light touch, 2+ and equal deep tendon reflexes, and normal gait ([Tr. 707]).  Her treatment plan included recommendation to continue non-surgical care ([Tr. 708]).

(Tr. 20-22).

The ALJ determined that the medical record did not establish functional limitations beyond those recognized in the RFC, citing: (i) Jones's test results being unremarkable or showing stability and no unexpected or worsening findings; (ii) Jones's examinations demonstrating that she had intact system functioning – showing "no acute distress, regular heart rate and rhythm, clear lungs, 5/5 strength, normal range of motion and strength, intact neurological functioning, cooperative, behavior, full orientation, answered questions, and followed commands"; (iii) medical evidence not supporting the use of cane as medically

necessary; and (iv) Jones having a conservative course of treatment that provided stability and

some notable improvement.  (Tr. 23).  The ALJ added:

> The undersigned is cognizant that the degree of limitation that a person might
> experience from fibromyalgia and other impairments might not necessarily be
> reflected in a particular treatment note; however, in the instant matter, the
> longitudinal record does not reflect a significant degree of physical functional
> limitation from the claimant's physical impairments. Her physical examinations do
> not reflect the degree and frequency of pain one would expect based on her
> testimony.  The physical examinations findings also do not support loss of strength,
> range of motion, sensation, reflexes, or coordination that would support a disabling
> degree of physical limitation.  The medical evidence, even with a consideration of
> limitations from pain, does not support a greater degree of limitation than that
> which is set forth in the above residual functional capacity assessment.

(Tr. 23).

The ALJ determined that RFC sufficiently accounted for and accommodated Jones's

physical and mental impairments, stating:

> sedentary exertion, postural, environmental hazard limitations and requiring a cane
> to ambulate account for the claimant's combined physical impairments and any
> deficits due to pain, tenderness, reduced strength, numbness/tingling, and fatigue.
> Reaching limitations also account for cervical spine conditions and diffuse pain.
> Mental limitations to understand, remember, apply information, concentrate,
> persist, and maintain pace to perform simple, routine, and repetitive tasks, but not
> at a production rate pace (i.e., assembly line work), simple work-related decisions
> and using her judgment and dealing with changes in the work setting, and
> occasionally interact with supervisors and coworkers and never interact with the
> public due to depressive and PTSD symptoms and account for varying mood,
> irritability, difficulty with concentration and completing tasks, and issues with
> short-term memory.
>
> The cumulative effects of the pain, fatigue, effects of treatment, and residual
> functioning related to physical impairments, in addition to the symptoms and
> effects of treatment related to the claimant's physical and mental impairments,
> support limiting the claimant to no more than sedentary exertion with additional
> limitations on climbing, postural activities, exposure to hazards, routine nature of
> tasks, production and time demands, workplace changes, and the nature and
> frequency of interactions with others as noted above.  Cervical conditions also
> support restricting the claimant to occasionally reach overhead bilaterally and
> frequently reach in all other directions bilaterally, and lumbar spondylosis/facet
> arthropathy and fibromyalgia support requiring a cane to ambulate.

(Tr. 23-24).  The ALJ stated that he was mindful of Social Security Ruling 12-2p when he considered Jones's fibromyalgia and recognized that "the degree of limitation that a person might experience from fibromyalgia and other impairments might not necessarily be reflected in a particular treatment note."  (Tr. 24).  Ultimately, the ALJ determined that the longitudinal record, Jones's physical examinations, and medical evidence did not support greater limitations than those set forth in the RFC.  (Tr. 24).

**B.      Analysis of Expert Opinions**

The ALJ found the opinions of the state agency consultants, Dr. Siddiqui and Dr. Hughes, to be persuasive because they were consistent with the evidence of record.  (Tr. 24-25).  But the ALJ adopted additional exertional and postural limitations in the RFC based on evidence presented at the hearing level.  (Tr. 24).  The ALJ also found the opinions of the state agency psychological consultants, Dr. Boulous-Sophy and Dr. Dietz, to be generally persuasive because their findings were consistent with record evidence.  (Tr. 25).

The ALJ found the opinion of consulting psychological examiner Dr. Billmann to be persuasive to the extent that it was consistent with no more than moderate RFC limitations, noting that his opinion was vague as to the specific degree of limitations Jones had in certain areas of the RFC.  (Tr. 25).  The ALJ found Dr. Billmann's opinion regarding Jones's ability to manage her own funds as unpersuasive because it was inconsistent with Jones's self-completed function report, in which she indicated that she was able to pay bills, count change, handle a savings account, and use a checkbook or money orders, and that her ability to handle money had not changed since the onset of her condition.  (Tr. 25 (citing Tr. 226)).

The ALJ found the illegibly signed August 1, 2022 Physical Residual Functional Capacity Assessment form unpersuasive because it: (i) consisted of checked boxes without

18

supporting information or explanation; (ii) was "inconsistent with examination findings that indicated unremarkable findings of normal gait, no assistive device, and normal fine motor coordination"; and (iii)  was " not supported by the record as a whole that included evidence from routine treatment, including outpatient visits, physical therapy, medication, and injections that provided improvement."  (Tr. 25-26).  Finally, the ALJ considered and found that a typed statement from Dr. Morton excusing Jones from work on February 22, 2022 was unpersuasive because, even though Dr. Morton was Jones's treating provider, the statement, "[P]rovided by functional limitations and was only for a limited duration."  (Tr. 26 (citing Tr. 622)).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for

evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e),

416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

## B.   Step Four – RFC Limitations

Jones contends that the ALJ erred in determining the RFC and finding Jones capable of sedentary work with certain restrictions, because the ALJ did not consider all of her impairments and their combined effect on her ability to perform work.  ECF Doc. 10 at 7.  Jones specifically argues the ALJ: (i) failed to address Jones's impaired manual dexterity in the RFC; (ii) improperly assessed the limiting effects of her fibromyalgia; and (iii) found mental health limitations that were unsupported by substantial evidence.  *Id.* at 7-13.  Jones also asserts that the ALJ improperly assigned only partial credibility to her subjective symptom complains.  *Id.* at 13-16.  She argues that the ALJ erred because: (i) the medical record contains substantial evidence supporting her complaints and treatment for chronic and severe neck and back pain; (ii) nothing in the medical record contradicts or calls into question her subjective symptom complaints; and (iii) the ALJ cited unremarkable evidence that was "cherry picked" from the record.  *Id.* at 14-15.

The Commissioner responds that the ALJ applied the proper legal standards when considering all of Jones's impairments, including her diminished manual dexterity, and the physical and mental limitations set forth in the RFC are supported by substantial evidence.  ECF Doc. 12 at 8-11.  The Commissioner further argues that substantial evidence supports the ALJ's

decision to discount Jones's subjective symptom complaints.  *Id.* at 11-13.  The Commissioner points to the following as evidence that undermines Jones's allegations: (i) Jones's conservative course of treatment, which provided stability and notable improvement; (ii) Jones reporting improvement in her symptoms; (iii) record evidence belying Jones's claim she needed a cane; and (iv) Jones's daily activities and part-time work.  *Id.* at 11-12.  The Commissioner further argues that the ALJ still found a highly restrictive RFC and Jones is essentially requesting that the court improperly reweigh the evidence.  *Id.* at 12-13.

At Step Four, the ALJ must consider a claimant's subjective symptom complaints in determining a claimant's RFC.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 649, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

When evaluating a claimant's subjective symptom complaints, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't

require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  However, such objective evidence is often unavailable in the case of fibromyalgia, which is characterized by the lack of "objectively alarming signs."  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost never exists).  Nevertheless, as with other impairments, the lack of corroborating medical evidence is not itself dispositive of the severity of a claimant's impairments. SSR 12-2p, 2012 SSR LEXIS 1, at *14; SSR 16-3p, 2016 SSR LEXIS 4, at *12-13.  In such cases, the ALJ must:

> consider all of the evidence in the record, including the [claimant's] daily activities, medications, or other treatments the [claimant] uses, or has used, to alleviate symptoms; the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other people about the [claimant's] symptoms.

SSR 12-2p, 2012 SSR LEXIS 1, at *14; *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18-19. Moreover, the ALJ must "consider a longitudinal record whenever possible because the

symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 2012 SSR LEXIS 1, at *17.

### 1.    Physical Impairments

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Jones's subjective symptom complaints and RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by: (i) expressly considering all the evidence on the record, including all of Jones's impairments and symptoms, objective medical evidence and other evidence, opinion evidence, and Jones's statements regarding her symptoms; and (ii) clearly explaining that he discounted Jones's subjective symptom complaints because her statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical and other evidence – including Jones's reported daily functioning, the examination findings of record, and the persuasive portions of medical opinions.  20 C.F.R. §§ 404.1520(e), 416.929; SSR 16-3p, 2016 SSR LEXIS 4, at *9-10; *Felisky*, 35 F.3d at 1036; (Tr. 18-26).

Additionally, to the extent that Jones seemingly argues that the ALJ erred when he failed to address the manipulative capabilities of Jones's hands in the hypotheticals to the VE, *see* ECF Doc. 10 at 8-9, Jones waived any concern about this issue when she raised no objections or questions on this issue at the ALJ's hearing.  *See Zimmerman v. Comm'r of Soc. Sec.*, No. 1:18-cv-1233, 2019 U.S. Dist. LEXIS 167019, at *19-20 (N.D. Ohio Sep. 27, 2019) (collecting cases); *see also Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 405 (6th Cir. 2016 ("By failing to raise her concerns . . . during her hearing, Plaintiff waived any objection."); *Haas v. Comm'r of Soc. Sec.*, No. 4:16-cv-11817, 2017 U.S. Dist. LEXIS 140867, at *15 (E.D. Mich. Aug. 1, 2017) ("Even if the ALJ made an error, the Sixth Circuit has made clear that this error was waived

when claimant's attorney neither objected at the hearing nor took the opportunity to probe this issue on cross-examination of the VE.").  I recommend that any claim of a deficient hypothetical to the VE (which allegedly would make any RFC crafted in reliance on VE testimony also deficient) be rejected as waived.

Even if Jones had not waived the issue, her claim regarding the ALJ's analysis of Jones's manual dexterity capabilities fails on the merits.  Contrary to Jones's argument, I find that the ALJ specifically referred to and accounted for Jones's impaired manual dexterity when creating the RFC, with the ALJ noting Jones had complained that she: (i) had tingling in her left 4th and 5th fingers; (ii) dropped things with her left hand; and (iii) had pain and numbness in her left 4th and 5th fingers that worsened with overuse.  (Tr. 20-22).  When examining the medical evidence, the ALJ noted neurological examinations in which Jones displayed normal coordination, normal fine motor control, grossly intact neurological functioning, and 5/5 motor power.  (Tr. 21-22).  Moreover, the ALJ found that Jones's allegations of physical functional limitations were not entirely consistent with the record.  (Tr. 22-23).  The ALJ stated that the limitations in the RFC (sedentary level work; postural and environmental hazard limitations; and requiring a cane to ambulate) accounted for Jones's combined physical impairments, including "any deficits due to pain, tenderness, reduced strength, *numbness/tingling*, and fatigue."  (Tr. 23) (emphasis added).

The record also belies Jones's argument that the ALJ failed to consider all of her medically determinable impairments – severe and non-severe – when he determined her RFC. ECF Doc. 10 at 7.  It is apparent, when we read the ALJ's decision in its entirety, that the ALJ did not: (i) fail to consider evidence, (ii) rely only upon the objective medical evidence, (iii) cherry-pick the evidence, or (iv) "play doctor."  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (noting that courts must "read the ALJ's decision as a whole

and with common sense").  Instead, the ALJ wrote nine pages in which he discussed Jones's subjective symptom complaints, the medical evidence of her impairments, the opinion evidence, and analyzed why he believed certain evidence supported the RFC and other evidence was inconsistent with the degree of limitations alleged by Jones.  This satisfied his obligation under the regulations and applicable Social Security Rulings.  20 C.F.R. §§ 404.1520(e), 404.1529(c)(3), 416.920(e), 416.929(c)(3); SSR 96-8p, 1996 SSR LEXIS 5; SSR 16-3p, 2016 SSR LEXIS 4; SSR 02-1p, 2012 SSR LEXIS 1 at *18; (Tr. 18-26).

Concerning Jones's fibromyalgia specifically, I find that the ALJ applied the proper legal standards in evaluating Jones's subjective symptom complaints and determining the RFC.  As Jones concedes, the ALJ expressly mentioned and discussed SSR 12-2p during his analysis of Jones's fibromyalgia.  ECF Doc. 10 at 9-11.  The ALJ acknowledged Jones's fibromyalgia symptoms – fatigue, radiating pain in hands, neck, back, hips, numbness/tingling, needing the use of a cane to walk, poor sleep, etc.  (Tr. 18-22).  The ALJ then cited substantial evidence which supported his conclusion that Jones's subjective complaints, including those about the severity of her fibromyalgia, were not consistent with other evidence in the record.  And the ALJ explained how the RFC adequately accounted for Jones's functional limitations and severe impairments.  Such evidence included: (i) Jones's conservative course of treatment, which demonstrated notable improvement and stability of symptoms;[1] (ii) test results that were

---

[1] A claimant's conservative treatment can constitute substantial evidence in supporting the ALJ's decision to discount a claimant's subjective symptom complaints.  *See Tweedle v. Comm'r of Soc. Sec.*, 731 F. App'x 506, 508 (6th Cir. 2018) ("It appears that Tweedle's pain was for the most part adequately controlled with medications, and the ALJ appropriately considered Tweedle's conservative treatment history in discounting his claim of disabling pain."); *see also Hauser v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 1808, 2014 WL 48554, at *9 (S.D. Ohio) ("In terms of medical care, it is proper to classify taking prescription medications and receiving injections as 'conservative' treatment."); *Dinkins v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 40155, 2014 WL 1270587, at *11 (N.D. Ohio) (providing that "conservative treatment" could include the use of narcotic pain relievers, anti-inflammatory medications, and neurological medications).

unremarkable or showed stability and no unexpected or worsening findings; (iii) generally mild or unremarkable examination findings, which demonstrated no acute distress, regular heart rate and rhythm, clear lungs, 5/5 strength, normal range of motion and strength, intact neurological functioning, cooperative behavior, full orientation, and the ability to follow commands; (iv) medical evidence that demonstrated that a cane was unnecessary, and that Jones had walked with a normal gait without an assistive device as recently as 2022; and (v) Jones's reported daily functioning.  (Tr. 22-24); *see also* (Tr. 297, 299-300, 330-359, 385, 407, 512-513, 517, 525, 542, 547, 591, 610, 623-635, 677, 686, 690, 695, 705, 707-708, 733-735).

Most importantly, the ALJ complied with the proper legal standards under SSR 12-2p by not relying solely on the lack of objective findings, but instead considering the longitudinal record and noting Jones's own statements about how her fibromyalgia symptoms had progressed. SSR 12-2p, 2012 SSR LEXIS 1, at *17; *Swain*, 297 F. Supp. 2d at 990; *see* (Tr. 21-22, 26).  Thus, the ALJ reasonably determined that Jones's fibromyalgia was, on balance, "either improving or, at worst, stable." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (indicating that a diagnosis of fibromyalgia does not automatically entitle claimants to disability, particularly when there is substantial evidence that their symptoms are either improving or stable).

Additionally, to the extent that the ALJ found Jones's subjective complaints were supported by the record evidence, the ALJ provided limitations that accounted for her various symptoms and impairments by limiting her to a reduced range of sedentary work with specific postural, reaching, and environmental limitations, as well as requiring the use of a cane. (Tr. 17-18, 23).  The ALJ's decision is further supported by the state agency medical consultants'

opinions, which found that Jones's physical impairments were not work-preclusive and provided specific physical limitations that the ALJ incorporated in his decision.  (Tr. 24-25, 70-72, 83-85).

Even though Jones's briefs argue for a more restrictive RFC, supported by cites to numerous medical records, this argument missed the mark. *See Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion."). Even if a preponderance of the evidence could support a finding for a more restrictive RFC, the ALJ's decision cannot be second-guessed because it was reasonably drawn from the record and fell within the Commissioner's "zone of choice."  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477; *Mullen*, 800 F.2d at 545.

Here, the ALJ provided an explanation that was sufficient to permit the court to assess how the ALJ evaluated Jones's subjective symptom complaints. SSR 16-3p, 2016 SSR LEXIS 4 at *26.  Moreover, a review of the ALJ's decision and the discussion of the evidence is sufficient to allow the court to conclude that the ALJ fulfilled his obligation to consider all the evidence, he did so in compliance with SSR 12-2p, and he drew reasonable conclusions regarding the limitations in Jones's physical RFC.  To summarize, the ALJ provided analysis which followed the regulatory framework, was supported by substantial evidence, and was sufficient to create and accurate and logical bridge between the evidence and the result.  *See Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 404.1520(e).

## 2.    Mental Impairments

The ALJ also applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Jones's subjective symptom complaints of her mental impairments and in establishing the RFC's non-exertional limitations.  42 U.S.C. §

405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations when he: (i) considered all of Jones's mental health symptoms, including her PTSD, depression, and difficulties with short-term memory, concentration and completing tasks; (ii) considered the relevant opinion evidence; and (iii) explained that Jones's alleged functional limitations were inconsistent with other evidence, including reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions. 20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *9-10; (Tr. 18-19, 21-25).  The ALJ crafted the RFC to account for Jones's mental impairments and mental limitations, explaining:

> Mental limitations to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e., assembly line work), simple work-related decisions and using her judgment and dealing with changes in the work setting, and occasionally interact with supervisors and coworkers and never interact with the public due to depressive and PTSD symptoms and account for varying mood, irritability, difficulty with concentration and completing tasks, and issues with short-term memory.

(Tr. 23).

The ALJ also considered the opinions of the state agency psychological consultants when he established the mental health limitations of the RFC.  (Tr. 25).  Dr. Boulous-Sophy and Dr. Dietz opined that Jones possessed only moderate mental limitations and she was: (i) "able to understand, carry out, remember, and perform simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work) but would complete all end of day goals; involving only simple, work-related decisions with the ability to adapt only to routine work place changes"; and (ii) "occasionally able to interact with supervisors and co-workers and . . . have superficial non-transactional contact with the general public."  (Tr. 25, 67, 73-74, 80-81, 85-87).  The ALJ found these opinions generally persuasive because they were consistent with Jones's

29

presentation and functioning during repeated medical examinations and her ability to leave home for work and attend appointments.  (Tr. 25).

To the extent that Jones challenges the ALJ's consideration of Dr. Billmann's opinion, it appears the ALJ here too applied the proper legal standards.  The ALJ was required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  An ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).

As noted by the ALJ, Dr. Billmann opined that Jones suffered from significant limitations in certain areas: (i) maintaining attention and concentration; (ii) maintaining persistence and pace to perform simple tasks; and (iii) responding appropriately to work pressures in a work setting. (Tr. 25, 566-567).  However, Dr. Billman's opinion did not include any specific functional limitations.  (Tr. 566-567).  As such, the ALJ found Dr. Billmann's opinion partially persuasive, to the extent that it was consistent with no more than moderate mental limitations, because the opinion was vague as the specific degree of these alleged limitations.  (Tr. 25); *see Quisenberry*

*v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018) (providing that an ALJ may properly discount a vague opinion that does not provide any specific functional limitations and expresses functional limitations in vague terms).  The ALJ also found that Dr. Billman's opinion that Jones might not be able to manage her own funds was unpersuasive because it was inconsistent with Jones's own function report, in which she indicated that she was able to pay bills, count change, handle a savings account, and use a checkbook or money orders, and that her ability to handle money since her conditions began had not changed.  (Tr. 25) (citing Tr. 226).

In the end, the ALJ concluded that Jones's mental limitations were not work-preclusive, and he found that the RFC did not require more restrictive limitations because: (i) the ALJ discounted Jones's statements about the severity of her mental limitations, as they were inconsistent with unremarkable examinations and functional observations in the record; (ii) Jones received a conservative course of treatment and displayed no worsening findings; and (iii) the RFC sufficiently accounted for her mental limitations and impairments.  (Tr. 22-24).  The ALJ's explanation was sufficient to allow for meaningful review and was supported by substantial evidence. *Id.*; *see also* (Tr. 67, 73-74, 80-81, 85-87, 566-567).

Thus, regarding Jones's mental impairments, the ALJ's analysis followed the regulatory framework, was supported by substantial evidence, and was sufficient to build an accurate and logical bridge between the evidence and his conclusions.  *See Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 404.1520(e).

## VI.    Recommendation

Because the ALJ in every respect applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Jones's application for SSI be affirmed.

Dated: September 29, 2023

Thomas M. Parker
United States Magistrate Judge

_____

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).